## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**AL-HADDAD COMMODITIES CORPORATION**

      **Petitioner,**

      **v.**                                             **Civil Action No. 2:07cv7**

**TOEPFER INTERNATIONAL ASIA PTE., LTD.**

      **Respondent.**

### <u>OPINION & ORDER</u>

This is an action to confirm an arbitration award pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958 (the "New York Convention"), 21 U.S.T. 2517, T.I.A.S. No. 6997, implemented at 9 U.S.C. § 207 <u>et seq.</u>, entered in favor of Petitioner Al-Haddad Commodities Corporation ("ACC" or "Petitioner") on December 15, 2006, in the amount of $2,006,570.10.  For the reasons stated herein, Respondent Toepfer International Asia Pte., Ltd.'s ("Toepfer's" or "Respondent's") Motion in Opposition to Petition to Confirm Arbitration Award and Cross-Petition to Vacate the Award [Doc. Nos. 2 & 5] is **DENIED** and ACC's Petition to Confirm Arbitration Award [Doc. No. 1] is **GRANTED**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Factual Background

ACC is a commodities trader specializing in the supply of commodities to markets in the Middle East and Africa and operating under the laws of the state of Georgia.  <u>See</u> Resp.'s Mem. in Opp. & Cross-Pet., Owen F. Duffy Aff. [hereinafter "Duffy Aff."] at 2 .  On October 27 2005,

ACC entered into a sales contract (the "Contract") with Toepfer, which maintains its principal place of business in Singapore and is a branch office of Toepfer International, an agricultural commodity trading business based in Hamburg, Germany, and a subsidiary of Archer Daniels Midland.  Id.; see Pet. to Confirm Ex. A, Sales Contract.  Under the Contract, ACC agreed to purchase, and Toepfer agreed to sell, a quantity of "US No. 2 Long Grain White Rice," to be shipped by bulk vessel to Umm Qasr, Iraq, by December 31, 2005, "at the latest."  Id. at 1-2.  Toepfer tried to deliver the rice by at least two different vessels.  Loading of the rice onto the first vessel began on January 9, 2006, but was interrupted on January 11, 2006, after the vessel owner refused to go to Iraq; a replacement vessel was found to be unsuitable for the shipment.  See Mem. in Opp., Duffy Aff. at 8 & Ex. D at 6-12.  The Contract sets forth the terms and conditions of the sale and shipment.  Pet. to Confirm Ex. A at 1-3.  The final paragraph of the Contract provides that "[a]ll other terms and conditions as per GAFTA [The Grain and Feed Trade Association] 122 and Arbitration as per U.S. Rice Millers Association Rules and Regulations."  Id. at 3.

A dispute arose between the parties regarding the parties' performance under the Contract.  See Mem. in Opp. Ex. D, Claim Submissions of ACC of Sept. 25, 2006 & Ex. E, Toepfer's Ans. to ACC's Demand for Arbitration of Nov. 14, 2006.  According to ACC, Toepfer failed to load the vessel and ship the rice to Iraq as required by the Contract.  Toepfer contended that ACC was in breach of the Contract for failing to provide Toepfer with a deposit or bank guarantee against possible demurrage claims as prescribed in the Contract.  See id. Ex. C at 1, Arbitral Panel Award.  ACC claimed that Toepfer waived the demurrage guarantee requirement.

On September 25, 2006, ACC sent a demand for arbitration to the U.S. Rice Millers'

2

Association ("RMA"),  headquartered in Arlington, Virginia.  Pet.'s Mem. in Supp. of Pet. to

Confirm & in Opp. to Cross-Petition to Vacate [Doc. Nos. 9 & 10], Lucienne C. Bulow Aff.

[hereinafter "Bulow Aff.] ¶¶ 3, 7.   The Chairman of the Arbitration Committee for the RMA

nominated a five-member Arbitral Panel ("Panel"), which, after a period of party-led discovery,

held a hearing on the matter in the Houston, Texas, offices of American Rice Inc., on December

12, 2006.  Id.  The dispute was to be governed by the RMA Arbitration Rules, which prescribe

the procedures to be followed for arbitration of disputes and the issuance of an ultimate decision

and award.  See Pet. to Confirm Ex. B, U.S. Rice Millers' Association Arbitration Rules.  On

December 19, 2006, the Panel rendered a Final Award (the "Award").  It found that Toepfer

breached its obligations under the Contract "by failing to nominate a suitable vessel and

otherwise arrange for the loading and shipment of the rice to Umm Qasr."  Id. Ex. C at 2.  The

Panel found that although ACC breached its obligation to provide a bank guarantee for

demurrage claims, Toepfer, by its actions, waived that breach.  Id. at 1.  The Panel ordered

Toepfer to pay ACC $2,006,570.10 within seven days from the date of the Award.  Id. at 3.

>    **B.**    **Procedural History**

>    ACC filed its Petition to Confirm Arbitration Award in this Court on January 8, 2007.

The Petition asks the Court to enter an order confirming the Award and enforcing the judgment

entered on it pursuant to 9 U.S.C. §§ 201-208.  On January 31, 2007, Toepfer filed, subject to

defect for lack of a certificate of service, an answer and cross-motion against ACC [Doc. No. 2].

Correcting the defect, Toepfer filed a motion entitled "Opposition to Petition to Confirm

Arbitration Award and Cross-Petition to Vacate the Award" and accompanying memorandum on

February 20, 2007 [Doc. Nos. 5 & 6], to which the Petitioner responded.[1]  This Court held a

hearing on the parties' submissions on April 2, 2007.

## II.    DISCUSSION

### A.    Petition to Confirm and Cross Petition to Vacate

Under the New York Convention ("Convention") and its implementing legislation, the

Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201-208, any party to an arbitral award falling

under the Convention may within three years of the award "apply to any court having

jurisdiction under [9 U.S.C. § 201 et seq.] for an order confirming the award as against any other

party to the arbitration."  9 U.S.C. § 207.[2]  The Court "shall confirm the award unless it finds

one of the grounds for refusal or deferral of recognition or enforcement of the award specified in

the said Convention."  Id.  The parties do not dispute that Respondent has been properly served

and is subject to personal jurisdiction in this Court, and that the requirements of venue and

subject matter jurisdiction are satisfied. [3]

---

[1]Respondent's memorandum designated as Document Number 6, filed on February 20, 2007, is identical to the memorandum it replaced, Document Number 3, which was filed without a certificate of service on January 31, 2007.  The Court will refer to both as "Mot. in Opp.." for purposes of this Opinion and Order.  Respondent filed a Reply Memorandum in Opposition to Petitioner's Memorandum on March 2, 2007 [Doc. No. 14].

[2]The parties do no dispute that the arbitration at issue, which involved a foreign entity in a dispute with a U.S. entity concerning a shipment of goods from the United States to Iraq, constitutes a non-domestic arbitration subject to the New York Convention.  See Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Art. 1(1), 21 U.S.T. 2517, T.I.A.S. No. 6997; see also 9 U.S.C. § 207.

[3]In its Answer, Toepfer raised two jurisdictional affirmative defenses to ACC's Petition: (1) that the Petition was not properly served on Toepfer, and therefore the Court lacks personal jurisdiction to confirm the Award against Toepfer, and (2) that the Eastern District of Virginia is an improper venue.  The parties did not address these arguments in their briefs, and Toepfer notified the Court at the hearing that it had withdrawn both arguments.  April 2, 2007, Hr'g Tr. 38:14-39:14.  Venue exists pursuant to 9 U.S.C. §§ 9-10 and the Petition was served on the

The "process and extent of federal judicial review of an arbitration award are substantially circumscribed." Patten v. Signator Ins. Agency, Inc., 441 F.3d 230, 234 (4th Cir. 2006). Section 10 of the FAA lists the grounds that may form the basis for vacatur of an arbitration award.[4] These include proof that an award was procured by fraud, corruption, or undue means, or resulted from an arbitrator's evident partiality or corruption, or "[w]here the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent to and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." Id. § 10(a)(1)-(3).  In addition to the statutory grounds set forth in § 10, common law permits courts to vacate the award of an arbitrator that evidences a "manifest disregard" of the law. Shearson/Am. Exp., Inc. v. McMahon, 482 U.S. 220, 259, 107 S.Ct. 2332, 2355, 96 L. Ed. 2d 185 (1987); Patten, 441 F.3d at 235; accord Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 388 (2d Cir. 2003).

Toepfer argues that the Award should be vacated because (1) the arbitrators were "guilty of misconduct" pursuant to § 10 in "refusing to postpone the hearing . . . , in refusing to hear evidence . . . , and other behavior" by which Respondent was "prejudiced"; and (2) the Award was rendered in "manifest disregard of the law."  Mot. in Opp. at 3-4.

### 1.      Misconduct

---

Secretary of the Commonwealth of Virginia and forwarded to Toepfer in accordance with Va. Code
§ 8.01-329 [Doc. No. 4].

[4]The provisions of 9 U.S.C. §§ 1-16 of the FAA apply to proceedings brought under the Convention so long as the statute does not conflict with the Convention or the implementing legislation at 9 U.S.C. §§ 201 et seq.  9 U.S.C. § 208.

Toepfer alleges that the arbitrators were "guilty of misconduct" under § 10(a)(3) because the Panel (1) failed to postpone the arbitration hearing despite Toepfer's request that it do so; (2) failed to consider the parties' submissions prior to the hearing; (3) permitted a witness to testify by telephone instead of by video link, as planned, and without a previously disclosed witness statement; and (4) limited the presentation of evidence and argument.  Toepfer relies upon the facts set forth in the affidavits of Owen F. Duffy, an attorney representing Toepfer, and Mark T. O'Neil, who represented Toepfer in the arbitration proceedings between ACC and Toepfer.  In response, ACC relies on the affidavit of Lucianne C. Bulow, its counsel at the arbitration hearing.

### a.       The Panel's Refusal to Postpone the Hearing

Toepfer's alleges "misconduct" in the Panel's decisions to hold a hearing "just six weeks" after the arbitration was demanded, and to reject Toepfer's request to adjourn the arbitration hearings until March 2007 to provide more time for discovery.  Mot. in Opp. at 4.

In its letter to the RMA asking for an arbitration, ACC requested an immediate hearing. Mem. in Supp., Bulow Aff. ¶ 7.  On October 19, 2006, Lee Adams of American Rice Inc., the Chairman of the RMA, notified the parties that a hearing in the matter would be held in Houston, Texas, on December 12, 2006.  See Mot. in Opp. Ex. F, Letter of Oct. 19, 2006.  On November, 15, 2006, Toepfer requested that the hearings be adjourned until March 2007 because the December 12 date was "completely unrealistic" in light of discovery demands.  See id. Ex. I, Email from Helle Kjaerstad of Nov. 15, 2006.  ACC vehemently objected.  Id. Exs. J, K.  The Panel, in a pre-hearing order issued by email on November 17, 2006, refused to change the date of the hearing.  See id. Ex. M, Email from Lee R. Marks of Nov. 17, 2006.

A court "may vacate an arbitration award when a request for postponement is arbitrarily denied or when the denial leads to the inability of the party to present 'pertinent and material evidence.'" Investor Relations Servs., Inc. v. Michele Audio Corp. of Am., No. 1:04CV0565, 2006 WL 2571028, at *3 (July19, 2006) (quoting Naing Int'l Enters., Ltd. v. Ellsworth Assocs., Inc., 961 F. Supp. 1, 2-3 (D.D.C. 1997) and citing Fairchild & Co. v. Richmond, Fredericksburg & Potomac R.R., 516 F. Supp. 1305, 1313 (D.D.C. 1981)).  An arbitral panel should be granted a degree of discretion, however, as long as it had a "reasonable basis" for refusing to postpone. Investor Relations Servs., 2006 WL 2571028, at *3 (quoting Naing, 961 F. Supp. at 3 and Fairchild, 516 F. Supp. at 1313-14)).

The Court finds nothing arbitrary in the Panel's refusal to postpone the hearing.  RMA Arbitration Rule 7 states, "[a]ll arbitrations shall be held at a place and time designated by the Arbitration Committee."  Pet. to Confirm Ex. C, Arbitration Rule 7.  Arbitration Rule 9(a) provides that "[t]he arbitrators shall proceed expeditiously to establish the facts of the case by all appropriate means."  Id. Rule 9(a).  The Panel did just that by scheduling and holding a hearing on December 12, 2006, eleven weeks after ACC submitted the dispute for arbitration.  There is no evidence that the Panel's refusal to postpone the hearing was made in bad faith or for self-serving reasons, or that refusal to postpone resulted in the exclusion of pertinent and material evidence.  Cf. Tube & Steel Corp. of Am. v. Chicago Carbon Steel Prods., 319 F. Supp. 1302, 1304 (S.D.N.Y. 1970) (finding that arbitrators engaged in misconduct for conducting arbitration in respondent's absence).  Respondents cite no rule that was violated by the Panel's failure to "provid[e] grounds for its decision" to refuse to push back the hearing date.  See Mot. in Opp. at 5.  Whether it was "not unreasonable for Toepfer to request that the arbitration hearing be

adjourned" is irrelevant.  Id.  The Court finds no basis for vacating the Award on this ground.

### b.    The Panel's Consideration of the Parties' Submissions

Toepfer's next contention is that the Panel was "guilty of misconduct . . . in refusing to

hear evidence pertinent and material to the controversy," § 10(a)(3), in particular by failing to

consider the written evidence and documents submitted by the parties prior to the hearing.  See

Mot. in Opp. at 6 (citing Duffy Aff. ¶ 88(b) & Id. Ex. Z, Mark T. O'Neil Aff., ¶¶ 9, 15-16, &

28).

On the morning of the hearing, the Panel permitted, over Toepfer's objection, ACC to

present additional documentary evidence and a legal opinion from Queen's Counsel Timothy

Young concerning points of English law on the construction of the Contract.  Id. Duffy Aff. ¶

88(a)-(b); see id. Ex. AA, Legal Opinion of Timothy Young.[5]  Mr. O'Neil had received Mr.

Young's opinion by email from Ms. Bulow on the evening of December 11, 2006, but, lacking

Internet access, was unable to read it until being provided a copy by fax from his London Office

the following morning prior to the hearing.  Id. Ex. Z, O'Neil Aff. ¶ 8.  Toepfer argues that the

Panel "did not review, and could not have reviewed," the additional evidence and Mr. Young's

twenty-four page legal opinion prior to the hearing.  Id. Duffy Aff. ¶ 88(b).  According to Mr.

O'Neil, the presentation of Mr. Young's legal opinion was a violation of the Panel's November

17, 2006, order that "[a]ny submissions by a party relevant to English law shall be produced

---

[5]It is unclear from the record what "documentary evidence" other than Mr. Young's legal
opinion Toepfer is referring to.  See Mot. in Opp. Ex. Z, O'Neil Aff. ¶ 8 ("I received a further
email from Ms Bulow attaching a large amount of additional disclosure and a document
purporting to be an opinion obtained from an English barrister, Timothy Young, QC, on those
aspects of English law pertaining to the dispute.").  Ms. Bulow, ACC's counsel, sent Mr. O'Neil
a "hard copy" of ACC's documents via messenger at his hotel on the afternoon of the day before
the hearing.  Mem. in Supp., Bulow Aff. at ¶¶ 17-18 & Exs. 4 & 5.

within 14 days." See Mem. in Supp., Bulow Aff. Ex. 2, Email from Lee R. Marks of Nov. 17, 2006. Mr. O'Neil found it to be "immediately obvious" that Mr. Young's legal opinion was "based on a critique of Toepfer's opinion" and objected to its admission at the hearing on grounds that "Toepfer's position on English law was undoubtedly compromised and/or prejudiced in circumstances in which the Tribunal allowed the submission of Timothy Young QC's opinion so late in the day, that barrister having had the advantage of seeing and assessing Toepfer's case on English law before drafting his own opinion." Id.

A federal court may vacate an arbitrator's award only if the arbitrator's refusal to hear pertinent and material evidence deprives a person of a "fundamentally fair hearing." UMWA v. Marrowbone Dev. Co., 232 F.3d 383, 385, 388 (4th Cir. 2000); see also Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901, 763 F.2d 34, 40 (1st Cir. 1985) ("A federal court may vacate an arbitrator's award only if the arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings.") (citing 9 U.S.C. § 10(c)).

Under this circumscribed standard of review, the Court refuses to second-guess the Panel's ruling allowing ACC to present Mr. Young's expert opinion. First, the Panel's decision to allow Mr. Young's opinion resulted in the *inclusion* of evidence, not the *exclusion* of evidence, and, as such, is plainly not a "refus[al] to hear evidence" under § 10(a)(3). There is no evidence that the Panel ignored Toepfer's submissions on English law. On December 6, 2006, three business days before the hearing—and five days after the Panel's fourteen-day deadline for submitting opinions on English law—Toepfer submitted two affidavits totaling sixty-five pages, a seventeen-page opinion by two barristers, and 121 pages of exhibits. Mem. in Supp., Bulow

Aff. ¶ 11.  In addition, it is less than clear that Mr. Young's opinion was "pertinent and material to the controversy."  § 10(a)(3).  According to Ms. Bulow, Mr. Young's opinion was merely a supplement to ACC's representations of English law contained in submissions provided to the Panel and opposing counsel in advance of the hearing.  Indeed, ACC had previously emailed Toepfer's counsel and the Panel all of the English cases and textbooks on which ACC relied.  Mem. in Supp. at 3.  Mr. O'Neil asserts that there is "much less" between the opinions of Toepfer's barristers and Mr. Young "than Mr. Young's tone would suggest.  To the extent that there are differences, they are mostly ones of emphasis."  Reply Mem., O'Neil Second Aff. at ¶ 18.  Mr. O'Neil provides specific examples of areas in which Mr. Young and Toepfer's barristers, Mrs. Parsons and Russell, were in agreement.  Id. ¶¶ 18(a)-(c).  If Mr. O'Neil is correct that the differences between the barristers' opinions were minimal, then this fact greatly undercuts Toepfer's assertion that it was prejudiced by Mr. Young's opinion.

Mr. O'Neil asserts that when he raised the topic of English law during the hearing, the Panel Chairman remarked that he was "not interested in 'all the fancy lawyer stuff' and that the Panel had the opinions of each party's barristers and could read those if it 'so chose.'" Mem. in Opp. Ex. Z, O'Neil Aff. ¶ 14.  The Chairman's statements, if truly made, do not prove by any standard that the Panel "summarily dismissed legal opinion on the application of English law and did not consider the written evidence and documents prior to the hearing."  Id. Duffy Aff. ¶ 88(c).  Throughout the proceeding, the five-member Panel was joined by a legal adviser who was presumably there to ensure that the Panel paid attention to the parties' legal arguments.  Pet. to Confirm Ex. C, Award; see also Mem. in Supp., Bulow Aff. ¶ 45.  Mr. O'Neil also asserts that "[i]t was quite obvious that the Tribunal had not read any of the bundles previously provided,

including the various and lengthy submissions served by both parties."  Mem. in Opp. Ex. Z, O'Neil Aff. ¶ 15.  Mr. O'Neil's statement is directly contradicted by the Award itself, which states: "Having read the submissions of the parties, and listened to examination of the witnesses and argument by counsel at the hearing, the Panel concludes as follows . . . ."  Pet. to Confirm Ex. C, Award; see also Mem. in Supp., Bulow Aff. ¶26 ("When the hearing started, as I recall, the Chairman stated that the Panel had read all our submissions and was familiar with the case.").  The only support Mr. O'Neil offers for his speculative statement is his opinion that he was not given enough time to deliver his oral presentation because the Panel limited each side to only twenty minutes to do so, and the fact that the Award was one-and-a-half pages long.  The Court refuses to question the Panel's imposition of time limitations on the parties, which were applied equitably to both sides, and declines to draw any inferences from the length of the Award.  In sum, Toepfer has failed to show that the Panel refused to hear material evidence or that it was deprived of a "fundamentally fair hearing" by the Panel's handling of Mr. Young's opinion on English law.  See UMWA, 232 F.3d at 385, 388.

### c.      Telephone Testimony and Witness Statements

Another alleged example of misconduct was the Panel's acceptance of telephone testimony from Mr. Sahib Al-Haddad ("Mr. Al-Haddad"), a witness for ACC.  Toepfer argues that it was prejudiced because (1) Mr. Al-Haddad was ACC's only witness; (2) Mr. Al-Haddad had not presented a witness statement to the Panel prior to the hearing; (3) Mr. Al-Haddad did not possess copies of the documents submitted to the Panel during the hearing, and therefore there was no fair opportunity to cross-examine him; and (4) there was "no fair opportunity for the Arbitration Panel to effectively weigh Mr. Sahib Al-Haddad's credibility based only [on] a

telephone discussion." Mem. in Opp., Duffy Aff. ¶ 88(c).

On November 13, 2006, Ms. Bulow notified the Panel by email that Mr. Al-Haddad "will be attending[.]"  Mem. in Supp. Ex. Q, Email from Lucianne C. Bulow of Nov. 13, 2006.  On November 24, 2006, Ms. Bulow notified the Panel and opposing counsel that Mr. Al-Haddad would not attend the hearing because his doctor had "forbidden" him to travel to Houston for "health reasons."  Id. Email from Lucianne C. Bulow of Nov. 24, 2006.  Ms. Bulow told the Panel that Mr. Al-Haddad would be available to testify "under oath on December 12 via video conferencing from Amman, Jordan," and "Mr. Basim Al-Haddad, who is President of Al-Haddad Commodities Corporation, will attend the hearing . . . ."  Id.  Ms. Bulow did not elaborate on Mr. Al-Haddad's health problems.  The Panel accepted Ms. Bulow's statement that Mr. Al-Haddad could not attend, and granted her request for a video conferencing link.  Id. Ex. 2.  The Panel director even suggested that Mr. Al-Haddad could testify by telephone instead.  See Mem. in Supp., Bulow Aff, ¶ 22 (The RMA director "often stated that if we encountered technical difficulties and could not use video, we could always have Mr. Al-Haddad testify by telephone.").  On the day of the hearing, however, Toepfer learned that no arrangements for video conferencing had been made, and the Panel lacked the appropriate computer terminal for video conferencing provided via the Internet.  Mem. in Opp. Ex. Z, O'Neil Aff. ¶ 10.  Instead, the Panel permitted, over Toepfer's objection, Mr. Al-Haddad to testify by telephone.

The Panel's decision to permit Mr. Al-Haddad to testify via telephone may have been permissible under the RMA Arbitration Rules, but in the Court's view, it was an arbitrary deviation from the Panel's own order of November 17, 2006, in which it stated, "Any witness statement to be submitted by a party shall be submitted to the other party and the Panel within 14

days.  *If a witness statement is submitted from a witness employed by a party, that party should be prepared to produce the witness at the hearing.*"  Mem. in Supp., Bulow Aff. Ex. 2, Email from Lee R. Marks of Nov. 17, 2006 (emphasis added).  At this Court's hearing, counsel for ACC asserted that a "witness statement was not required" and suggested that because ACC did not submit a witness statement for Mr. Al-Haddad, it did not have to produce him at the hearing. See April 2, 2007, Hr'g Tr. 7:22-8:6, 17:25.  This reasoning is absurd in light of the unambiguous language in the November 17, 2006, order requiring that witness statements be exchanged within fourteen days of the order, and that a party who intends to call an employee as a witness "should be prepared to produce the witness at the hearing."  The Panel appears to have ignored its order when it overlooked Petitioner's failure to submit a witness statement for Mr. Al-Haddad and accepted, without any inquiry, Ms. Bulow's assertion that Mr. Al-Haddad was unable to attend for health reasons.[6]  The Court finds that the Panel's decision allowing Mr. Al-Haddad to testify by video, and not in person, was arbitrary in light of its November 17, 2007, order; however, the Court does *not* find that the consequences of that decision were prejudicial to Toepfer, which is a precondition to vacating an award pursuant to § 10(a)(3).  Toepfer had notice well before the hearing that Mr. Al-Haddad would not appear in person.  Most significantly, Toepfer had the opportunity, which it exercised, to extensively cross-examine Mr. Al-Haddad about the substance of the contract dispute, including the demurrage guarantee and ACC's access

---

[6]Exhibit 9 of Ms. Bulow's affidavit submitted to this Court is a physician's "Medical Report" dated July 12, 2006, written in English on the letterhead of The Islamic Hospital in Amman, Jordan.  Mem. in Supp., Bulow Aff. Ex. 9.  The letter indicates that "2 years ago" Mr. Al-Haddad underwent an angioplasty, and in July 2006 he was advised to have a cardiac catheterization "as soon as possible."  Id.  There is no indication of any kind as to whether or when this procedure was performed, or what his medical condition was when the Panel's hearing took place in December, some four months after the date of the physician's report.

to lines of credit.  Mem. in Opp. ¶¶ 18-19.  While cross-examination in person or by video would have been preferable to cross-examination by telephone, the fact that telephonic testimony was ultimately used did not render the proceedings fundamentally unfair.  Accordingly, the Court concludes that the Panel's decision to allow Mr. Al-Haddad to appear by telephone was not misconduct under § 10(a)(3).  Moreover, there was no issue that Toepfer had failed to deliver in accordance with the Contract, but only whether they were excused by virtue of ACC's failure to obtain a demurrage guarantee.

A separate concern is ACC's alleged failure to provide a witness statement for Mr. Al-Haddad.  As noted above, by correspondence on November 17, 2006, the Panel ordered that "[a]ny witness statement to be submitted by a party shall be submitted to the other party and the Panel within 14 days."  Mem. in Supp., Bulow Aff. Ex. 2, Email from Lee R. Marks of Nov. 17, 2006.  Toepfer read this order as requiring the parties to exchange witness statements simultaneously, but ACC disagreed with this interpretation.  See Reply, O'Neil Second Aff. ¶ 7.  On December 5, 2006, Ms. Bulow informed opposing counsel that it did not intend to present factual witness statements, and that "we will have two live witnesses who will explain ACC's claim.  This is what we understand the procedure under the rules of the USA Rice Millers Association to require."  Mem. in Supp. Ex. U, Email from Lucianne Bulow of Dec. 5, 2006.  Mr. O'Neil complained to Ms. Bulow about her intentions, and asked the Panel to "immediately order[] Claimants to either serve witness statements or have their witness evidence shut out."  Id. Ex. U, Email from Mark. O'Neil of December 5, 2006.  The Panel Chairman refused to issue any such orders and denied all pending requests for further orders.  See id. Ex. V, Email from Lee R. Marks of Dec. 5, 2006 ("[N]o further orders will be issued at the current time, and all pending

14

requests for further orders are denied.  To the extent documents have been requested but not produced, or other evidentiary issues are unresolved, the Panel is of course free to draw such inferences as are necessary to ensure a just resolution of the issues presented.").  Mr. O'Neil asserts that "absent a witness statement from Mr. Al-Haddad in advance of the hearing, I had absolutely no idea what case (on witness evidence) it was which Respondents had to answer and had only Mr. Al-Haddad's 30 minute soliloquy to work from.

> By contrast, Mr Al-Haddad knew precisely what [Toepfer's witnesses] Mr Roske and Mr Deranieh's evidence would be in circumstances in which Toepfer had quite properly served witness statements in advance of the hearing as ordered by the Tribunal.  This undoubtedly prejudiced Toepfer's case insofar as absent any foreknowledge of Mr Al-Haddad's witness evidence, the same could not be properly tested in cross-examination, and Toepfer did not know what case it had to answer.

Mot. in Opp. Ex. Z, O'Neil Aff. ¶ 17.

In the Court's view, ACC's position that it did not need to provide a witness statement for Mr. Al-Haddad is plainly inconsistent with the Panel's November 17, 2006, order that any witness statements "shall be submitted to the other party and the Panel within 14 days."  The Panel presumably was aware of this inconsistency, however, when on December 5, 2006, it expressly refused to intervene in the parties' dispute over witness statements despite Toepfer's protestations.  In so doing, the Panel exercised its discretion under the RMA Arbitration Rules, which permit the arbitrators to "conduct any hearing as they deem fit."  Pet. to Confirm Ex. B, RMA Arbitration Rule 9(c).  Moreover, the extent to which Toepfer was disadvantaged by the lack of a witness statement for Mr. Al-Haddad is less than clear in the record; according to Ms. Bulow, Petitioner's factual submissions delivered to Toepfer in advance of the hearing and Mr. Al-Haddad's testimony covered the same ground.  <u>See</u> Mem. in Supp., Bulow Aff. ¶ 27 ("There

was absolutely no mystery as to what Mr. Al-Haddad would cover and did cover in his testimony.").

Toepfer alleges other misconduct in connection with Mr. Al-Haddad's testimony. During Mr. O'Neil's cross-examination of Mr. Al-Haddad, the Panel ordered Mr. O'Neil to stop questioning him about Mr. Al-Haddad's alleged conviction in Germany in 2003 for smuggling arms to the Saddam Hussein regime in Iraq. Mem. in Opp. Ex. Z, O'Neil Aff. ¶ 18. In addition, the Panel allowed ACC to present witness evidence from Mr. Al-Haddad Junior (Basim Al-Haddad, the President of ACC) over Toepfer's objection that "we had never heard of Mr Al-Haddad Junior's intention to give evidence and, again, on the basis that we had no witness evidence from him and therefore were totally unprepared and/or prejudiced." Id. ¶ 20. The Panel also allowed, over Toepfer's objection, ACC to introduce evidence not previously disclosed to the other side—a photograph of a mobile phone and a witness statement of Mr. Raheem Taher. Id. ¶ 22. Finally, the Panel rejected Toepfer's requests to call Mr. Taher to test his evidence and to allow Mr. Duraid Mahasneh to testify by telephone in order to impeach Mr. Al-Haddad. Id.

Although the Panel's handling of Mr. Al-Haddad's cross-examination, particularly its refusal to permit Mr. Mahasneh to rebut Mr. Al-Haddad's testimony, gives the Court some concern, the bottom line is that Toepfer has not shown any prejudice caused by these decisions. Toepfer did not notify the Panel or the other side prior to the hearing of its intent to call Mr. Mahasneh as a witness; it therefore had no reasonable expectation of being able to call him.[7]

---

[7]Ms. Bulow states that she does "not recall that Mr. O'Neil stated 'Mr. Mahasneh was expecting a call.'  Mr. Al-Haddad had mentioned to me that Dr. Duraid Mahasneh was willing to testify on behalf of ACC, but I decided that we had enough evidence to prove our case and that

Moreover, it is unclear what effect, if any, Mr. Mahasneh's testimony would have had, or indeed, what that testimony would have been.  Toepfer asserted during this Court's hearing that it was "blindsided" by certain parts of Mr. Al-Haddad's testimony, and that Mr. Mahasneh was critical to rebutting that testimony.  April 2, 2007, Hr'g Tr. 30:19-31:14.  Toepfer's attorney, Mr. O'Neil, states that Mr. Mahasneh's testimony would have gone "straight to the heart of (Mr Al-Haddad's) credibility."  Mem. in Opp. Ex. Z, O'Neil Aff. ¶ 22.   According to Ms. Bulow, however, Mr. Mahasneh would have only buttressed Mr. Al-Haddad's version of the facts.  <u>See</u> Mem. in Supp., Bulow Aff. ¶ 36 ("If Dr. Duraid Mahasneh would have testified, his testimony would not have been positive for Toepfer.  He would have stated that Toepfer admitted that it breached the contract."); <u>see also id.</u> Ex. 15, Email from Sahib Al-Haddad of Nov. 7, 2006.  No proffer was made as to the actual testimony of Mr. Mahasneh.

The actions of the Panel as a whole may seem to be in disregard of its own rules and somewhat arbitrary.  However, there was no showing that their actions prejudiced Toepfer's position.  To Mr. O'Neil the Panel's hearing may well have appeared "painfully farcical" and a "complete sham from start to finish."  Mem. in Opp. Ex. Z, O'Neil Aff. ¶¶ 26, 28.  Yet the Court's inquiry is limited to whether the arbitrator provided "a fundamentally fair hearing" that includes giving "each of the parties to the dispute an adequate opportunity to present its evidence and arguments."  <u>Generica, Ltd. v. Pharmaceutical Basics, Inc.</u>, 125 F.3d 1123, 1130 (7th Cir. 1997) (quoting <u>Hoteles Condado Beach</u>, 763 F.2d at 39)).  The evidentiary record compels the conclusion that Toepfer had a meaningful opportunity to cross-examine Mr. Al-Haddad, and that the Panel's orders, which may have negatively affected his cross-examination by Toepfer, do not

---

we did not need a third witness."  Mem. in Supp., Bulow Aff. ¶ 36.

17

constitute "misbehavior by which the rights of any party have been prejudiced."  9 U.S.C. § 10(a)(3).

### d.    Limiting the Presentation of Evidence and Argument

Toepfer next argues that the Panel committed misconduct because it (1) "explicitly refused to hear evidence" of English law; (2) refused to consider the live testimony of Mr. Raheem as to Mr. Sahib Al-Haddad's credibility;[8] (3) "unduly and arbitrarily" limited the length of the hearing, thus "essentially refus[ing] to hear the evidence being proffered by Toepfer; and (4) limited the parties to "unreasonable" time limits during the hearing.  Mot. in Opp. at 9.

The Court has already considered Toepfer's argument that the Panel refused to hear evidence of English law, and again rejects it, finding no supporting evidence in the record.  As to Toepfer's second argument, that it was prejudiced by the Panel's refusal to permit the telephonic testimony of Mr. Raheem in order to impeach Mr. Al-Haddad's testimony, id. Duffy Aff. ¶ 88(d), the Court reiterates its conclusion that no prejudice resulted from the Panel's handling of the cross-examination of Mr. Al-Haddad.  As to Toepfer's third and fourth arguments, as stated earlier, the Court refuses to second-guess the Panel's time limits for oral argument.  Despite Toepfer's protestations, the Panel limited the parties to twenty minutes each for the presentation of their respective cases, thirty minutes for the presentation of evidence by witnesses, forty minutes for cross-examination, and fifteen minutes to conclude their case.  See id. Ex. Z, O'Neil Aff. ¶ 14.  These time limitations surprised counsel for both sides, each of whom apparently

---

[8]It is unclear whether the reference to "Mr. Raheem" in Toepfer's memorandum and Mr. Duffy's affidavit is a reference to Mr. Raheem Taher, whose testimony Toepfer sought to introduce but was refused, according to Mr. O'Neil.  Mem. in Opp., Duffy Aff. ¶ 88(d).  Mr. O'Neil refers to Mr. Taher and does not mention a Mr. Raheem.  Id. Ex. Z, O'Neil Aff., ¶ 22.

expected more time.  See id. ("I had considerable sympathy for Ms Bulow who was then faced with immediately leading off with a condensed opening of her case, having only 20 minutes within which to present the same.").  Indeed, Ms. Bulow became "visibly emotional and stated 'you cannot do this, this is unfair,'" when the Panel cut her off on closing argument.  Id. ¶ 25. There is no evidence to support Toepfer's contention that these time limitations deprived either party of an adequate opportunity to present their evidence and argument.

In conclusion, the Court finds no prejudicial grounds justifying the vacatur of the Award pursuant to § 10(a), and Respondent's Motion to Vacate on these statutory grounds is hereby **DENIED**.

### 2.   Manifest Disregard of the Law

Toepfer also seeks to vacate the Award on the non-statutory ground that the Panel acted with a "manifest disregard of the law" in that it "refused to apply English law."  Mot. in Opp. at 12-13.

A party seeking to vacate an arbitration award based upon a "manifest disregard" of the law "shoulders a heavy burden."  Remmey v. PaineWebber, Inc., 32 F.3d 143, 149 (4th Cir. 1994).  An arbitrator's legal determination "'may only be overturned where it is in manifest disregard of the law,' and an arbitrator's interpretation of a contract must be upheld so long as it 'draws its essence from the agreement.'"  Patten, 441 F.3d at 235 (quoting Upshur Coals Corp. v. United Mine Workers, Dist. 31, 933 F.2d 225, 229 (4th Cir. 1991)).  In this Circuit, a manifest disregard of the law is established "only where the 'arbitrator[ ] understand[s] and correctly state[s] the law, but proceed[s] to disregard the same.'"  Patten, 441 F.3d at 235 (citing Upshur, 933 F.2d at 229).  Morever, an arbitration award does not fail to draw its essence from the

contract "merely because a court concludes that an arbitrator has 'misread the contract.'" Id.

(internal quotation marks omitted).  An arbitration award fails to draw its essence from the

contract "only when the result is not 'rationally inferable from the contract.'" Id. (quoting Apex

Plumbing Supply, Inc. v. U.S. Supply Co., 142 F.3d 188, 193 n.5 (4th Cir. 1998)).

The Panel's Award includes a six-paragraph "Facts" section followed by sections labeled

"Findings" and "Relief."  Pet. to Confirm Ex. C, Award.  The "Facts" section states that the

Contract was "to be governed by the laws of England" and sets forth the parties' obligations

under the Contract.  Id.  The "Findings" section reads in its entirety as follows:

> The Panel finds
>
> (i) ACC breached its obligation to provide a deposit or bank guarantee in the amount of $250,000 as security for demurrage claims, but Toepfer by its subsequent conduct waived and condoned this breach and is estopped to rely on it.  Subsequent to the breach and prior to February 2, Toepfer acted as if a contract was in place.  Toepfer nominated the M/V Jade Breeze, made strenuous efforts to get the rice loaded and shipped, and declared the demurrage breach only when it became clear that it would be unable to fulfill its responsibility to load and ship the rice.  Moreover, the failure timely to post security for the demurrage was of little consequence to Toepfer since, by controlling the documents, it always had the ability to enforce its rights to such security; in contrast, termination of the Contract was bound to have, and did have, draconian consequences for ACC.
>
> (ii) Toepfer breached its obligations under the Contract by failing timely to nominate a suitable vessel and otherwise arrange for the loading and shipment of the rice to Umm Qaser [sic].

Id.  There was no showing that this ruling, which went to the very essence of the case, was in

any way incorrect.  The waiver was based on the actions of Toepfer in loading one ship which

then had to be unloaded, and then unsuccessfully trying to get a replacement ship to go to Iraq.

See Mem. in Opp. Exs. D & E.  It is apparent that the failure to load and deliver the rice was not

caused by ACC.  The section entitled "Relief" orders Toepfer to "pay to ACC the amounts set

forth below" and lists itemized damages based upon the damages "submitted by Ms. Bulow on

behalf of ACC." Id. n.1.  A plain reading of the Award leaves no doubt that the Award "draws

its essence" from the Contract and that the Panel's findings are "rationally inferable" therefrom.

See Patten, 441 F.3d at 235.

Toepfer relies heavily on Halligan v. Piper Jaffray, Inc., 148 F.3d 197 (2d Cir. 1998), in

which the United States Court of Appeals for the Second Circuit held that an arbitration award

should be vacated for "manifest disregard of the law" based upon the arbitrators' failure to apply

the applicable law to a plaintiff's age discrimination claim.  The court in Halligan found that the

arbitrators ignored "strong evidence" that the plaintiff had been fired because of his age, and,

although the arbitrators "have no obligation to do so," they did not explain their award.  Id. at

204.  The court went on to "make clear," however, that it was "not holding that arbitrators should

write opinions in every case or even in most cases:

> We merely observe that where a reviewing court is inclined to find that arbitrators
> manifestly disregarded the law or the evidence and that an explanation, if given, would
> have strained credulity, the absence of explanation may reinforce the reviewing court's
> confidence that the arbitrators engaged in manifest disregard.

Id.  Lacking any such "strong evidence" that the Panel in this case ignored applicable English

law, Halligan does not support Toepfer's position.  In sum, Toepfer has failed to satisfy its

"heavy burden" of proving a "manifest disregard of the law" and the Court rejects Toepfer's

motion to vacate on this ground.  See Remmey, 32 F.3d at 149.

## I.    CONCLUSION

The Court detects something of a culture clash in this case, in which an arbitration panel

of American businessmen who apparently pride themselves on providing quick commercial

decisions held a hearing in Houston, Texas, over a contract governed by English law.  The

Contract required Toepfer to ship rice from the United States to Iraq, which Toepfer evidently failed to do because it was unable to secure a vessel.  The Panel's manner of proceeding surprised Toepfer's attorney, Mr. O'Neil, who has practiced arbitrations extensively in England and elsewhere and, in his words, had "[n]ever before (and hopefully will never again) experience[] anything quite like the arbitration before the RMA."  Reply, O'Neil Second Aff. ¶ 30.  Of course, Houston is not London.  In Texas lore, cowboys and Indians long ago replaced the knights and dragons of English lore.

Whether or not they regret it in hindsight, the parties selected the RMA in their contract as the forum for resolving any disputes arising from the contract.  Finding no evidence that the actions of the Panel resulted in substantial prejudice to Toepfer, the Court "will not substitute [its] judgment" for the arbitrator's.  Upshur, 933 F.2d at 231.   Accordingly, Respondent's Motion to Vacate the Arbitration Award of December 15, 2006, is hereby **DENIED** and Petitioner's Petition to Confirm Arbitration Award is **GRANTED**.

The Clerk of the Court is **DIRECTED** to enter judgment in accordance with this Opinion & Order and provide a copy of this to all counsel of record.

**IT IS SO ORDERED.**

_____/s/_____
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
April 19, 2007